**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Abdi Mohamed, et al.,

              Plaintiffs,

      v.

1st Class Staffing, LLC, et al.,

              Defendants.

Case No. 2:15-cv-3013

Judge Graham

<u>Opinion and Order</u>

      This religious accommodation suit stems from the decision of defendant employer Jacobson Warehouse Company, Inc. to cease allowing Muslim employees to use an area of the production floor for daily prayers during break times. Muslim employees had prayed in the otherwise empty and unused area for several years until Jacobson expanded its production lines. Jacobson converted the area into a space where it kept inventory and used forklifts.

      Plaintiffs do not dispute Jacobson's right to convert the space for business purposes,[1] but they challenge Jacobson's alleged failure to offer reasonable alternative sites for prayer. Plaintiffs contend that Jacobson made the decision to eliminate their prayer site without warning and that the alternate sites which Jacobson offered lacked a sufficient measure of cleanliness and isolation from noise and foot traffic. Because Jacobson's decision was announced soon before plaintiffs needed to pray, plaintiffs allegedly were left with the following choice: (1) pray in an alternate site offered by Jacobson, but do so knowing that the prayer performed would not satisfy plaintiffs' religious standards; or (2) leave the workplace to go pray elsewhere, but do so under the threat of losing their jobs if they left. The complaint asserts claims under Title VII of the Civil Rights Act of 1964 for failure to accommodate plaintiffs' religious practices and for retaliation. <u>See</u> 42 U.S.C. §§ 2000e-2(a), § 2000e–(j); 2000e–3(a).

      This matter is before the court on the motions for summary judgment filed by Jacobson (and its successors in interest, defendants Norbert Dentressangle S.A. and XPO Logistics, LLC) and

---

[1] Pls.' Response Brief (doc. 69) at 3 ("The Muslim observers realize that safety is important . . . . [T]he Muslim observers are not arguing that Defendants had to continue accommodating them on the production floor.").

by defendant 1st Class Staffing, LLC, a staffing agency which Jacobson utilized to hire plaintiffs. For the reasons that follow, those motions are denied.

## I. Facts

### A. General Background

Plaintiffs are fourteen individuals,[2] some of whom began their employment at Jacobson as early as 2012. All are refugees – thirteen from Somalia and one from Senegal. Each plaintiff is a practicing Muslim of the Sunni branch.

Jacobson is a logistics company that offers transportation, distribution, warehousing and packaging services. Jacobson provides packaging services to Mars Pet Food at a facility in West Jefferson, Ohio, and its operations occupy a segregated portion of the Mars facility. Jacobson controls a production floor, breakroom with adjacent restrooms, business office for management personnel, lobby/reception area and an enclosed outdoor patio. An outdoor parking lot is available to employees.

Jacobson directly employs management- and supervisory-level staff, but it uses staffing agencies to employ the production workforce. During the relevant timeframe, 1st Class supplied between 250 and 400 employees, including plaintiffs, to work as "line associates" on ten or more production lines. Line associates performed "pick and pack" duties, which involved removing cans of pet food from cartons and repackaging them for retail sale. The repackaged products were placed onto pallets and transported to a shipping area within the Mars facility.

The production lines operated from Monday through Thursday on two shifts. First shift ran from 5:00 a.m. to 3:30 p.m. and second shift ran from 4:00 p.m. to 2:30 a.m. The first shift had 200 to 220 line associates and the second shift had 100 to 150. All of the plaintiffs worked second shift.

Workers on each shift received two 15 minute breaks and a 30 minute lunch break. Each break was conducted in two stages, such that half of the second shift employees took their first 15 minute break at 6:00 p.m. and the other half took theirs at 6:15 p.m. The lunch breaks were taken at 9:00 p.m. and 9:30 p.m. and the second round of 15 minute breaks took place at 1:00 a.m. and 1:15 a.m.

The General Manager for Jacobson at the Mars facility was Paul Hanna. Reporting to Hanna was Operations Manager David Nye. Jacobson assigned supervisors over the production

---

[2] On April 3, 2017, the court dismissed the claims of two plaintiffs, Abdi Jama and Omar Hassan, for want of prosecution.

lines. One of the production line supervisors was Sileymane Diako, a native of Senegal who was assigned to the second shift during the events at issue.

1st Class had one or more onsite managers who maintained an office within Jacobson's business office at the Mars facility. These onsite managers performed support functions such as conducting job interviews, processing payroll and providing a job orientation session. One of 1st Class's onsite managers was Alba Lopez.

### B. Plaintiffs' Religious Beliefs and Practices

Prior to any of the plaintiffs' arrival at Jacobson, Muslim employees had used an empty area of the production floor to perform prayers during their breaks. Plaintiffs testified that they used this area to pray when they began their employment because they observed other Muslim employees already doing so without objection from supervisors. The area was situated near the breakroom and was approximately 20 feet by 30 feet in size. Defendants do not dispute that Muslim employees had been allowed to use the area to pray for several years.

In Islam, *salat* or ritual prayer is an expression of sincere faith. Muslims are to perform *salat* five times a day. Of importance to this case are two of the five prayers: the *maghrib* or sunset prayer and the *isha* or evening prayer. The sunset prayer is to be performed at dusk after the sun has set completely beneath the horizon. The evening prayer is to be performed after twilight has disappeared and before midnight. Punctual performance of each prayer is expected, although some flexibility is allowed in order to accommodate the worshiper's circumstances, such as work conditions. Many Muslims believe that they have a window of time in which to perform the prayers. (Expert Report of Kathleen Moore at 14-15). In January 2014, plaintiffs performed the sunset prayer during their 6:00 p.m. break and the evening prayer during their 9:00 p.m. lunch break.

The performance of ritual prayer involves several cycles of recitation while facing in the direction of Mecca. The cycles consist of a sequence of movements, including standing, kneeling, prostrating and sitting while reciting verses from the Qur'an. It took plaintiffs between three and five minutes to perform a prayer. (Ega Dep. at 60-61).

Prayers are to be performed in a clean space, free from human or animal bodily fluids and free from items such as cigarette butts, chewing gum and food wrappers and containers. (Moore Report at 16, 20). To create separation from the floor, plaintiffs placed a prayer mat or piece of cardboard on the floor and performed their prayer on top of the mat. (Ega Dep. at 24-25; S. Abdi Dep. at 89-90).

The prayer space must also be free from distraction because a prayer is invalidated when the penitent's concentration is broken. (Moore Report at 16). It is important that other people not cross in front of the penitent, to avoid both the risk of distraction and the appearance that the penitent is praying to a human being. (Id. at 17). Because the penitent prays with his eyes open, it is common for a Muslim to pray facing a barrier, such as a wall or curtain. (Id. at 18). The use of a barrier to create a prayer space is referred to as "satura." (Id.) Praying outdoors or in a wide-open space with no barrier is disfavored. (Id. at 18-19).

Women are to maintain separation from men when praying. If women and men are praying in the same area at the same time, separation is achieved by the women praying behind the men or by using a curtain or other movable barrier. (Moore Report at 20). During the second shift breaks, there were sometimes as many as 20 to 30 Muslim employees needing to pray and sometimes as few as 5. (S. Abdi Dep. at 96-97; Abikar Dep. at 78). Depending on when and how many Muslim employees arrived, they would pray in small groups, taking turns if necessary. (Abikar Dep. at 17-18, 76-77; Alin Dep. at 47). The area of the production floor that plaintiffs used for prayer was large enough for a small group of men to pray in front and a small group of women to pray in back. (S. Abdi Dep. at 91-93; Abikar Dep. at 76-77).

C.      **Increased Production at the Facility**

Jacobson began increasing production in September 2013. (Nye Decl. at ¶ 4). It added four production lines, installed a baler machine for waste cardboard and created a quality control area. (Id. at ¶¶ 4-5). Over the following months the space that plaintiffs had used to pray decreased in size as Jacobson installed 28-foot tall racking to store inventory and designated a forklift aisle in the area in late 2013. (Id.) A smaller area remained where Muslim employees prayed in November and December 2013. (Nye Dep. at 65-66). By the end of the year, it was "full of stuff," including pallets. (Id. at 66, 70).

D.      **Jacobson Eliminates the Prayer Space and Offers Alternate Sites**

In the morning of Thursday, January 9, 2014, Nye observed a Muslim employee praying in the forklift aisle located at or near the space that had been used for prayer. (Nye Dep. at 66-67). This raised safety concerns. (Id. at 67). Nye stood nearby for a few minutes to ensure that the employee could safely finish her prayer. (Id. at 68-69). He then went to Hanna and informed him of what he had observed. (Id. at 69).

After Nye told Hanna about seeing an employee praying in the forklift aisle, Hanna examined the area and decided that employees would no longer be able to perform prayers on the

production floor because it was unsafe. (Hanna Dep. at 88; Nye Dep. at 70-71). He instructed Nye to think about "other options . . . for areas that they could pray in." (Nye Dep. at 71).

Later in the day on January 9, Nye returned to discuss possible alternate prayers locations with Hanna. (Nye Dep. at 78). They decided that Muslim employees would be allowed to pray in the breakroom, the lobby, a fenced-in patio area and the parking lot and adjoining grassy areas outside.[3] (Hanna Dep. at 94-95; Nye Dep. at 75-76). Both Hanna and Nye had previously seen Muslim employees pray in the breakroom and lobby, and Hanna believed he had seen them praying outside. (Hanna Dep. at 89-91; Nye Dep. at 42, 51).

At some point on January 9, Hanna or Nye (or both) approached 1st Class manager Alba Lopez and told her that employees would no longer be allowed to pray on the production floor. (Lopez Dep. at 28; Nye Decl. at ¶ 10). Lopez remembers being told that "it was a safety issue" because of the forklifts, increased production and lack of space. (Lopez Dep. at 42). She was told that employees would be allowed to pray in the breakroom, lobby, the fenced-in patio and outdoors. (Id. at 43, 66).

At 2:53 p.m. on January 9, Nye sent an email to Lopez and copied four Jacobson supervisors, including Sileymane Diako. The email stated, "Starting on Monday, Alba is going to be telling all employees that when they pray, they must do so inside the breakroom. If you see them on the floor you need to remind them. It is too unsafe for them to be on the floor." (Doc. 47-5).

Nye spoke with Lopez shortly after sending the email. (Nye Dep. at 83). He explained the reason why employees would not be able to pray on the production floor and "explained exactly where . . . they could pray." (Id.)

On Tuesday, January 14 Lopez made the announcement that employees could not pray on the production floor.[4] (Lopez Dep. at 59; Diako Decl. at ¶4). She was not aware of any first shift Muslim employees who prayed during their breaks, and she made the announcement at the normal production meeting with employees about five minutes before the start of second shift at 4:00 p.m.. (Lopez Dep. at 48-49, 63-64, 69; Diako Dep. at 80). After making general announcements and

_____

[3]   The nature of the grassy areas is not clear from the record. Nye appeared to agree with legal counsel's characterization of there being about a 5 foot by 5 foot patch of grass near the patio. (Nye Dep. at 76). Elsewhere in the record, there is reference to there being grassy areas, in the plural. (Ega Dep. at 64-65; Hanna Dep. at 94-95). But one plaintiff described any grassy area as not being close to the building, and another could not remember any grassy area at all. (Ismail Dep. at 15; S. Abdi Dep. at 44-45).

[4]  There is no indication why Lopez made the announcement on Tuesday instead of Monday.

releasing most employees, she asked Muslim employees to stay behind to hear the announcement regarding the prayer space. (Abikar at 97-98; Ega Dep. at 45-46). Diako and another line supervisor, Adrian Juarez, were present at the meeting. (Diako Dep. at 67). Two of the plaintiffs, Shamey Abdi and Samba Diop, were not present for the meeting but did report for work. (S. Abdi Dep. at 21; Diop Dep. at 58).

Lopez told the employees that they could pray in the breakroom, lobby, patio or outside. (Lopez Dep. at 59; Diako Dep. at 77-79). These were the locations that Hanna had told her were acceptable. She also told them that they could pray in the restrooms, though Hanna had not included restrooms on his list. (Lopez Dep. at 59, 61). Lopez, who is Hispanic and describes herself as being reasonably proficient in speaking English, spoke to the Muslim employees in English. (Id. at 6).

A couple of the Muslim employees who understood English – Hamdi Abikar, Abdullahi Aden and Ahmed Ega – translated for the rest of the group. (Lopez Dep. at 68; I. Abdi Dep. at 17; Farrah Dep. at 27; Hajin Dep. at 28-29). Abikar and Ega recall being told that they could pray in the breakroom, lobby, restrooms or outside. (Abikar Dep. at 99-100; Ega Dep. at 37-39). One plaintiff recalls that upon hearing the breakroom being offered as an alternative, a member of the group suggested that the Muslim employees be allowed to take their break either 15 minutes early or 15 minutes late so they could have the breakroom to themselves. (Ismail Dep. at 23-28; 77-78). Lopez rejected this idea. (Id. at 24-25).

At that point before the start of the shift, the Muslim employees understood that they could no longer pray on the production floor, but some did not have an understanding of what alternate prayer sites would be available. (Aden Dep. at 38; Farrah Dep. at 26-27; Hajin Dep. at 29-30). When they either asked about where they could pray or stated concerns about the alternatives that Lopez had given, they were told that it was time to start their shift and that the matter would be discussed at the break. (Abikar Dep. at 101; Aden Dep. at 38; Ega Dep. at 50-51; Farrah Dep. at 27; Hajin Dep. at 30).

At the beginning of the 6:00 p.m. break, plaintiffs Hamdi Abikar and Rooda Alin went to perform their prayers at their usual spot, despite having heard the announcement. (Abikar Dep. at 102; Alin Dep. at 45-46). A Jacobson employee, possibly a forklift driver, attempted to stop Abikar from praying there and pushed Abikar with his hands. (Abikar Dep. at 101-02). Abikar insisted on praying and performed his prayer while the Jacobson employee went to report to supervisors what was happening. (Abikar Dep. at 101-02). Apparently, Alin performed her prayer as this was going

on. (Alin Dep. at 45-46). Soon, two forklift drivers and at least one 1st Class representative arrived at the area. (Abikar Dep. at 102; Alin Dep. at 29; Hajin Dep. at 30-31). Alin states that they loudly told her not to pray there anymore and that she felt threatened because they were so loud and close to her. (Alin Dep. at 29, 33; Alin NLRB Aff. at p. 2). Plaintiff Mohamed Hajin came to pray but was blocked from doing so by the forklift drivers. (Hajin Dep. at 30-31).

Muslim employees began to congregate nearby in the breakroom and lobby area. About 25 employees gathered. (Abikar Dep. at 105; Aden Dep. at 64-65; Farah Dep. at 37; Lopez Dep. at 74; Nye Dep. at 98, 117; Nye Decl. ¶ 11). The employees expressed their desire to pray in the same place they had been praying and asked where else they could pray. (Aden Dep. at 64; Ega Dep. at 55). Lopez came out into the lobby after a female Muslim employee came to her and asked where she could pray. (Lopez Dep. at 70-74) (testifying that she told the employee that she they could not pray on the production floor but could pray in the breakroom or lobby). According to Lopez, the employees were loudly complaining about where they could pray but she could not understand much of what they were saying. (Id. at 74-75). According to Aden, either Lopez or another 1st Class representative said that the Muslim employees could pray in the breakroom, lobby or outside. (Aden Dep. at 64). Aden and others responded that they could not pray in those places because of the noise, the foot traffic with people passing in front of them and the lack of sufficient room for men and women to pray separately. (Id.) Ega remembers the employees expressing to management that the breakroom and lobby were not acceptable because of the noise, people walking around and people eating; they also said that it was too cold to pray outside. (Ega Dep. at 39). Lopez could tell that they were objecting to the breakroom and lobby because "there's a lot of noise and people," but she did not know why they objected to the outside. (Lopez Dep. at 74, 81-82).

Nye and Diako came to scene after hearing the commotion. Someone, possibly Lopez, told Nye that the Muslim employees were upset about not being able to pray in their old location. (Nye Dep. at 95; Lopez Dep. at 75-76). The employees were loud and largely speaking Somali. (Nye Decl. at ¶ 11; Diako Decl. at ¶ 5).

Nye tried to "have a conversation with the group in the lobby area, but they . . . [were] yelling or cursing something . . . and everyone was kind of going back and forth yelling." (Nye Dep. at 95-96). Nye understood enough to know that they were questioning why they could not pray, and he told those with whom he could speak one-on-one that they could pray in the breakroom, lobby, patio or outside. (Id. at 96, 118; Nye Decl. at ¶ 11). He heard some of them say that they could not pray in the breakroom or lobby because there would be "other people in the room." (Nye Dep. at

97-98).  In Nye's view, people were nearby plaintiffs even when they prayed in the old spot, so he could not understand why they had an issue with the proposed alternatives.  (Id.)  But Nye felt unable to have a "rational conversation" with the group because they were "aggressive and upset." (Nye Dep. at 118-20; Diako Decl. at ¶ 6).  Some employees tried to negotiate with Nye to be able to pray in the old spot again, offering to sign a waiver of liability if they got hurt praying there.  (Nye Dep. at 98-99).  Nye rejected this proposal.  (Id.)

After several minutes, the group began moving outside.  (Aden Dep. at 69; Ega Dep. at 57). It is unclear to what extent they were instructed to go outside or were independently preparing to leave work because, in their view, they had no place to pray at the facility.  (Abikar Dep. at 32) (stating that Diako told the group to go outside); (Aden Dep. at 77-78) (testifying that he had already grabbed his coat and belongings because he needed to leave work since he did not have an acceptable place to pray); (Diako Dep. at 107) (testifying that the employees were leaving on their own); (Hussein Dep. at 23) (stating that employees were "pushed out").  According to Ega, the break time was almost over and Diako told them to either go back to work or to leave, "so people started to leave.  They were grabbing their food and stuff like that and their prayer mats and everybody was going outside . . . ."  (Ega Dep. at 57).

Diako followed the group outside to try to "talk and calm people down and convince them to stay."  (Nye Dep. at 102).  Diako felt that he, as an African, had a connection with the Muslim employees and knew how to talk to them.  (Diako Dep. at 75, 97-98, 109).  Some of the employees were shouting that if they could not pray, they would "no longer work for this company."  (Aden Dep. at 80).  A couple of the English-speaking employees again served as translators.  (Aden Dep. at 81-82; Alin Dep. at 31; Hajin Dep. at 37; Diako Decl. at ¶ 9).  Diako states that he explained that they could pray in the breakroom or lobby.  (Diako Decl. at ¶ 7).  Aden does not recall Diako having said what the alternatives were, but Aden acknowledges that he was fully aware by that point that the options were to pray in the breakroom, lobby or outside.  (Aden Dep. at 82-83).  Diako understood that their objection to praying in the breakroom was that there too many people for them to concentrate.  (Diako Dep. at 141-42).

With the break period at an end, Diako asked the group to go back to work and said that the next day he would talk to a supervisor about finding a place to pray.  (Nye Dep. at 103; Abikar Dep. at 36; Aden Dep. at 81-82; Diako Dep. at 115).  Diako offered that the group could appoint a couple of representatives to talk to one of Diako's supervisors the next day.  (Abikar Dep. at 33; Hajin Dep.

at 38).  Diako said that he could not guarantee a specific location where they could pray.  (Aden Dep. at 83).

According to many of the plaintiffs, representatives of the defendants told them that if they left work to go pray, they would be fired.  Plaintiffs' accounts vary somewhat concerning who made that statement and how it was said, but most plaintiffs agree that the gist of what they were told is that they would lose their jobs if they left work to go pray.  Some recall Diako directly stating "[I]f you're not going back to work, you are fired."  (Abikar Dep. at 34; Hajin Dep. at 39).  Others do not remember Diako using the word "fired," but do recall him saying something similar, such as, "If you leave now, you'll never come back" or that they would not be allowed back to work.  (Ismail Dep. at 70; Ega Dep. at 73-75).  Some plaintiffs recall Lopez or a "Hispanic supervisor" (which could be either Lopez or Jacobson line supervisor Adrian Juarez) telling the group something to the effect of, "[I]f you leave now you will lose your job" or, "If you go tonight and not back to work, never come back here."  (Mumin NLRB Aff. at p. 2; Aden Dep. at 85; Alin NLRB Aff. at p. 2).  Other plaintiffs do not remember hearing a direct threat as such, but felt compelled to leave because they felt like they had no acceptable place to pray at work.  (S. Abdi Dep. at 51; I. Abdi Dep. at 52; Hussein Dep. at 35).

Diako and Lopez deny having made any threats or similar statements.  (Diako Decl. at ¶ 12; Lopez Dep. at 100).

A police officer arrived at the facility at about 6:37 p.m.[5]  (Doc. 69-10).  Nye saw the officer, who seemed puzzled as to why so many employees were standing outside.  (Nye Dep. at 100).  Nye walked out and explained to him what was going on.  (Id.)  Once Diako had finished talking to the group, the officer told the group to either return to work or go home.  (Abikar Dep. at 34; Aden Dep. at 87; Nye Dep. at 101-02).

Some of the employees – perhaps as many as seven to ten – decided to return to work, but none of the plaintiffs did.  (Diako Dep. at 113; Diako Decl. at ¶ 11).  For plaintiffs, waiting until the next day did not solve the problem of how they would perform their sunset and evening prayers that night.  They told Diako, "We cannot wait.  It's against our religion to miss one prayer and you're telling us to miss two prayers."  (Abikar Dep. at 33).  Others said, "[I]f we [a]re not praying tonight, we are not going back to work."  (Aden Dep. at 84; Alin Dep. at 31).

---

[5]  It is not known who called the police.  The police report listed the call as a 911 hang-up from a cell phone, traceable to the area of the facility.  (Doc. 69-10).

With the plaintiffs having left, Jacobson shut down three production lines for the rest of the shift. (Nye Dep. at 103-04).

Lopez testified that she interpreted the act of plaintiffs leaving the facility as them quitting and abandoning their jobs. (Lopez Dep. at 101). 1st Class treated the plaintiffs as being terminated because they had abandoned their jobs. (Id.)

In the days that followed, several plaintiffs called or came to the facility and spoke with 1st Class representatives. Plaintiffs say they were uniformly told that they could not come back to work. (Aden Dep. at 86; S. Mohamed Dep. at 123; Hare Aff. at ¶ 12; Ismail Aff. at ¶ 13). According to Alin, she was told, "If you are from last night's shift, you can't come back. (Alin Dep. at 34).

**E.     Plaintiffs' Reasons for Rejecting the Alternative Prayer Sites**

None of the plaintiffs attempted to pray in the areas offered by Jacobson. (Abikar Dep. at 39-40; Ismail Dep. at 71). Plaintiffs viewed the proposed alternate prayer sites as simply unacceptable. (Ega Dep. at 61) ("How are you going to try? It's not allowed. It's not even clean."); (Ismail Dep. at 71-72) (characterizing the alternatives as not places to pray); (Mumin Dep. at 79) (stating that the alternatives were the equivalent of being "refused to pray"). They found the breakroom to be unsuitable for several reasons: (1) not being able to concentrate because of the large number of employees using the breakroom, with people walking around and the noise made from people talking, using the microwave and eating, (Aden Dep. at 90; Ega Dep. at 58; Ismail Dep. at 120, 130); (2) the space not being clean because of people eating food, (Ega Dep. at 59; Ismail Dep. at 71); and (3) not having enough space to pray, particularly for men and women to pray separately, (S. Abdi Dep. at 60; Farah Dep. at 50).

Plaintiffs had similar objections to praying in the lobby. The foot traffic in the lobby caused noise and created a risk of someone walking in front of a plaintiff as they prayed. It also made the floor dirty and unclean.[6] (Abikar Dep. at 27-28; Aden Dep. at 64, 92-93; Ega Dep. at 61-62; Hajin Dep. at 31). Moreover, the lobby lacked enough space for men and women to pray separately. (Abikar Dep. at 27-28; Aden Dep. at 64, 92-93).

---

[6]     Several plaintiffs testified that their old prayer space, as an unused portion of the production floor, was "clean" because there was "no dirt on it." (Ega Dep. at 62; S. Abdi at 46).

As for praying outside, plaintiffs believed that it was too cold, and some testified that they remembered there being snow on the ground.[7] (I. Abdi Dep. at 53; S. Abdi Dep. at 45; Abikar Dep. at 23, 34; Aden Dep. at 51-52, 96; Ega Dep. at 62, 66-67; Farah Dep. at 39-40; Hajin Dep. at 40). According to Ega, they could not pray on the grassy areas because "ice was covered everywhere." (Ega Dep. at 65). Another plaintiff did not recall there being any grassy area on which to pray. (S. Abdi Dep at 44-45).

In any event, many plaintiffs viewed the outside, including the parking lot and fenced-in patio, as unclean, given that people walked in those areas and there could be dirt and trash present. (I. Abdi Dep. at 53; S. Abdi Dep. at 29, 49-50). Some said that praying outside was "unsafe" because of the presence of vehicular traffic in the parking lot. (Abikar Dep. at 30; Ega Dep. at 63-64; Farah Dep. at 39-40). And some of the female plaintiffs held to a belief that it is generally not lawful or appropriate for women to pray outside. (I. Abdi Dep. at 52-53; S. Abdi Dep. at 33-34, 46-49, 108-109; Ismail Dep. at 16).[8]

### F.     A Designated Prayer Area is Created in the Breakroom

In March or April of 2014, a senior vice president for Jacobson visited the facility and directed that curtains be placed in the breakroom for the purpose of creating an area for Muslim employees to pray. (Hanna Dep. at 109; Nye Dep. at 123). Hanna instructed a maintenance worker to hang the curtains.[9] (Hanna Dep. at 20).

One of the plaintiffs who accepted reinstatement, Amina Ismail, described the new prayer area as having been created by clearing chairs and tables and by hanging curtains so that men and women have separate areas to pray. (Ismail Dep. at 14, 129).

---

[7] Defendants have submitted climatological data from the National Weather Service station in Columbus, Ohio (about 25 miles east of the Mars facility) showing that the high temperature in Columbus on January 14, 2014 was 47 degrees Fahrenheit, that the low was 35 degrees Fahrenheit, and that there was no snow or accumulated snow cover on the ground that day. (Doc. 46-5).

[8] The basis of this religious belief is uncertain from the record. Ismail testified that it was "the way I grew up," but she could not identify the source of the rule against women praying outside. (Ismail Dep. at 16). Similarly, Shamey Abdi testified that her parents taught her the belief that "women have to pray in a very decent indoor place," but she could not say whether this rule could be found in the Qur'an. (S. Abdi Dep. at 47-48). According to plaintiffs' expert, it is a cultural custom that Somali women do not pray outdoors. (Moore Report at 16).

[9] The record does not indicate the dimensions of the curtained-off prayer area in the breakroom or how much of the breakroom it occupies.

According to Nye, Muslim employees have provided positive feedback about the new prayer area and no complaints have been received. (Nye Dep. at 124-25). Ismail testified that the new prayer area is an acceptable place for her to pray. (Ismail Dep. at 14).

### G. NLRB Charge

On July 11, 2014, plaintiffs filed a charge with the National Labor Relations Board against 1st Class Staffing. (Doc. 69-6). The charge alleged that 1st Class had committed an unfair labor practice by removing plaintiffs' old prayer site, failing to provide them with a reasonable alternative and telling them not to come back to work.

The NLRB and 1st Class entered into a settlement agreement in January 2015 whereby plaintiffs were offered reinstatement to their former positions of employment and would be paid their lost wages and benefits, plus interest.[10] (Doc. 69-8).

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

_____

[10] Plaintiffs assert that they were not fully paid their lost wages and benefits (Doc. 69 at PAGEID 38).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III. Threshold Issue of Exhaustion of Administrative Remedies

In a separate motion for summary judgment filed by Jacobson (which 1st Class did not join), Jacobson argues that plaintiffs failed to exhaust their administrative remedies because they did not attend an EEOC fact-finding conference.

### A. Background

On March 19, 2014, plaintiffs filed charges of discrimination against Jacobson and 1st Class with the Equal Employment Opportunity Commission. (Iqbal Decl. at ¶ 6). An EEOC investigator, Sabrina Austin, interviewed each of the complainants through interpreters in June 2014. (Id. at ¶¶ 11, 12).

A year later on July 1, 2015, Austin emailed counsel for all parties requesting available dates for a fact-finding conference in Cleveland, Ohio.[11] (Doc. 32-2). Plaintiffs' counsel was told "to bring no more than three clients" to the conference. (Id.)

In response to the email, plaintiffs' counsel had a telephone conversation with Austin in which counsel requested that none of his clients be required to attend the fact-finding conference.

---

[11] The EEOC typically issues a right to sue letter within 180 days of receiving the charge. See 29 C.F.R. § 1601.28(a). The charges are not part of the record, but the right to sue letters, which are attached to one of the briefs, have case numbers that contain "2014." (Doc. 32-4). Assuming that the declaration of plaintiffs' counsel is correct that the charges were filed in March 2014 and that Austin interviewed the complainants in June 2014, there is no indication–other than the intervening NLRB proceeding–as to why Austin waited to contact the parties about a fact-finding conference until her July 2015 email, which is on the record. (Doc. 32-2).

(Iqbal Decl. at ¶ 15).  He made this request because of the need for interpreters and the indigent circumstances of the complainants.  (Id.)  Austin granted his request.  (Id. at ¶ 16).

On July 24, 2015, Austin issued a notice that the conference would be held on August 4, 2015.  (Doc. 32-3).  In the notice, Austin stated that she had "communicated with each party in regards to attendance."  (Id.)

On the day before the conference, Austin informed plaintiffs' counsel that her supervisor was insisting that at least one complainant attend the conference.  (Iqbal Dep. at ¶ 18).  Plaintiffs' counsel asked that the conference be postponed so that he could secure the attendance of one of his clients and an interpreter.  This request was denied.  Austin told counsel that he could not attend the conference without a client and that he, if not attending, should submit a written demand for settling the case.  (Id. at ¶ 20).  Counsel submitted a written demand on August 3.  (Id.)  The conference was conducted on August 4 without plaintiffs' counsel or a complainant present.  (Kinney Decl. at ¶ 12).

On August 19, 2015, the EEOC issued letters of Dismissal and Notice of Right to Sue to each of the complainants.  (Doc. 32-4).  These letters stated that the EEOC was unable to conclude that the information obtained established a violation of Title VII.

### B.    Applicable Law

To bring a Title VII claim, a plaintiff must: (1) file a charge with the EEOC within 300 days of the complained-of employment action and (2) bring suit within 90 days of receipt of the right to sue letter.  See 42 U.S.C. §§ 2000e–5(c), (e), (f)(1).  These requirements give the EEOC a "chance to investigate the charge and decide whether to sue" and encourage the parties "to resolve their dispute informally."  Doe v. Oberweis Dairy, 456 F.3d 704, 708 (7th Cir. 2006).  In order to facilitate investigation, the EEOC has the authority to "require a fact-finding conference with the parties prior to a determination on a charge of discrimination."  29 C.F.R. § 1601.15(c).  "The conference is primarily an investigative forum intended to define the issues, to determine which elements are undisputed, to resolve those issues that can be resolved and to ascertain whether there is a basis for negotiated settlement of the charge."  Id.  "If the complainant fails to cooperate and the failure prevents the Commission from resolving the charge, the Commission can dismiss it."  Oberweis, 456 F.3d at 709 (citing § 1601.18(b)).

Two Courts of Appeals have taken different positions on whether the failure to cooperate with the EEOC's investigatory efforts should bar a complainant from filing suit.  In Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304 (10th Cir. 2005), the court held that good faith cooperation with the EEOC is an element of the exhaustion of administrative remedies.  The court

reasoned that "the need for cooperation [is] implicit in Title VII" and found that requiring cooperation was "consistent with established public policy emphasizing the importance of voluntary cooperation in the enforcement of federal antidiscrimination laws." Shikles, 426 F.3d at 1313, 1315. The court took care to note, however, that "[p]erfect cooperation with the EEOC is not required." Id. at 1311. "[A] claimant must merely cooperate as part of a good faith attempt to allow the EEOC a reasonable opportunity to reach the merits of his or her charge. . . . It is only when a plaintiff's non-cooperation effectively prevents the EEOC's investigation and conclusion efforts such that the EEOC proceeding essentially becomes a sham or meaningless proceeding that a charging party's non-cooperation will amount to a failure to exhaust administrative remedies." Id. at 1311. The court dismissed the plaintiff's suit because it found that he had completely failed to cooperate with the EEOC investigator. Id. at 1307 ("Shikles and his attorney cancelled three scheduled telephone interviews with the EEOC investigator assigned to his case, failed repeatedly to return the investigator's telephone calls, and failed to submit information requested by the investigator. As a result, Shikles never provided the investigator with any information on his claim of discrimination beyond that contained in his initial EEOC charge.") (footnote omitted).

In Oberweis, the Seventh Circuit disagreed with Shikles and held that the statutory language contained no requirements to filing suit other than timely filing an EEOC charge and timely filing suit following the right to sue letter.

> There is . . . no basis in the language of Title VII for that position. The Tenth Circuit acknowledged the Supreme Court's 'admonition that no requirements beyond those in the statute should be imposed' . . . but it imposed them anyway. So the Tenth Circuit's gloss on Title VII is confessedly adventurous, and this will distress originalists. It is also in severe tension with the Supreme Court's recent observation, concerning the 'exhaustion' provisions in both Title VII and the Age Discrimination in Employment Act, that 'neither of these provisions makes reference to the concept of exhaustion, and neither is in any sense an exhaustion provision.' Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 2390, 165 L.Ed.2d 368 (2006). Title VII imposes procedural requirements as a precondition to bringing a suit in federal court that is an original proceeding rather than one to review agency action. Doe satisfied all those requirements. Title VII does not incorporate anything like the full apparatus of exhaustion, an apparatus designed as we have noted for cases in which judicial review of an adjudication or a rule is sought.

Oberweis, 456 F.3d at 710. The plaintiff in Oberweis had supplied information to the investigator but refused to be interviewed. The court found that any "cooperation" standard of exhaustion would be difficult to apply in practice and that allowing employers "to inject such an issue by way of defense in every Title VII case would cast a pall over litigation under that statute." Id. at 711 (noting

that while the standard was applied with "unusual ease" in <u>Shikles</u> because of plaintiff's complete failure to cooperate, in "the next case" "the complainant might sit for the interview but refuse to answer questions. In the case after that he would answer questions but do so cryptically. And in a subsequent case he would answer questions fully but fail to bargain in good faith over the employer's offer of a settlement").

Although the Sixth Circuit has not addressed this issue, a handful of district courts in the Circuit have done so. In <u>White v. N. Mich. Regional Hosp.</u>, 698 F.Supp.2d 950, 956 (W.D. Mich. 2010), plaintiff attempted to withdraw her EEOC charge and "unequivocally terminat[ed] her involvement in the EEOC administrative process." The court emphasized that the purpose of Title VII's administrative scheme is to encourage conciliation by the EEOC of workplace disputes. The court found that plaintiff had "thwarted the EEOC's function as an efficient conciliator, which is central to Title VII's statutory scheme" and "short-circuited . . . a carefully designed, integrated framework which combines investigation, conference and conciliation, and lastly–only it is unavoidable, after the other processes have been fully tried–litigation." <u>Id</u>. (internal quotation marks omitted). The court interpreted the statutory and administrative scheme as evidence of Congress's intent to make cooperation with the EEOC "a clear condition on the right to bring employment discrimination disputes to federal court." <u>Id</u>. Because plaintiff had not cooperated with the EEOC, the court dismissed her claim.[12]

In <u>Green v. Heidelberg U.S.A.</u>, 854 F. Supp. 511 (N.D. Ohio 1994), plaintiff failed to provide information or submit to an interview with the EEOC investigator. In a brief opinion, the court stated that "[t]he requirement of exhausting administrative remedies is to ensure that the EEOC will have been afforded an opportunity to attempt conciliation and voluntary dispute resolution." <u>Id</u>. The court dismissed the claim because plaintiff, in "never making himself available for interview or conciliation efforts, avoided the prerequisite of exhausting administrative remedies." <u>Id</u>.

Finally, in <u>Davis v. Mid-South Milling Co., Inc.</u>, No. 89-2829, 1990 WL 275945 (W.D. Tenn. Dec. 14, 1990), the plaintiff failed to provide requested information to the EEOC and refused to submit to an interview. In another brief opinion, the court found that plaintiff's abandonment of his EEOC charge deprived the EEOC of its role to investigate and conciliate the dispute and held that the Title VII suit must be dismissed for failure to exhaust administrative remedies. <u>Id</u>. at **2-3.

---

[12] The court did not discuss either <u>Shikles</u> or <u>Oberweis</u>, but it did cite <u>Shikles</u> with approval for the proposition that cooperation is an element of exhaustion of administrative remedies. <u>Id</u>.

## C.    Discussion

The Seventh Circuit's critique of <u>Shikles</u> is a sound one.  The statute itself contains only two perquisites to filing suit, and cooperation with the EEOC is not one of them.  42 U.S.C.  §§ 2000e–5(c), (e), (f)(1).  By imposing a cooperation requirement, <u>Shikles</u> transformed an administrative basis for the EEOC to dismiss a charge into a jurisdictional bar to filing a Title VII lawsuit.  The Supreme Court has cautioned against imposing jurisdictional requirements beyond those found in the statute.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 798-99 (1973); <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 816 n.19 (1980).

In a recent decision, the Tenth Circuit itself found that a broad reading of <u>Shikles</u> would be "at odds with the Supreme Court's instructions in subsequent cases and cannot be squared with current law."  <u>Gad v. Kansas State Univ.</u>, 787 F.3d 1032, 1039 (10th Cir. 2015) (footnote omitted).  Those subsequent cases are <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500 (2006) and <u>United States v. Kwai Fun Wong</u>, __ U.S. __, 135 S.Ct. 1625 (2015).  The Tenth Circuit described those cases as "reemphasiz[ing] that we should not treat requirements as jurisdictional without express congressional direction."  <u>Gad</u>, 787 F.3d at 1039-40 (citing <u>Arbaugh</u>, 546 U.S. at 516) (footnote omitted); <u>see also</u> <u>Kwai Fun Wong</u>, 135 S.Ct. at 1632 ("[P]rocedural rules . . . cabin a court's power only if Congress has clearly stated as much.") (internal quotation marks and alterations omitted).  The Tenth Circuit thus concluded that the holding in <u>Shikles</u> was of "limited force."  <u>Gad</u>, 787 F.3d at 1040.

Even if good faith cooperation with the EEOC is properly a prerequisite to filing suit, the case at hand is readily distinguishable from the facts in <u>Shikles</u> and the facts in the district court decisions noted above.  Here, every plaintiff submitted to an interview with the EEOC investigator, and there is no suggestion that they failed to provide any requested information.  Plaintiffs cooperated with the EEOC process until, 24 hours before the fact-finding conference, the EEOC reversed its prior instruction that none of the complainants needed to be present.  In contrast, the plaintiffs in the other cases wholly failed to provide any information to the EEOC beyond what was alleged in their charges.  Even by the standard in <u>Shikles</u>, plaintiffs in this case did not deprive "the EEOC a reasonable opportunity to reach the merits" of the charge, nor did they cause the EEOC proceeding to become "a sham or meaningless proceeding."  And notably the EEOC here, in contrast to <u>Shikles</u> and the other district court decisions, did not dismiss plaintiffs' charges on the grounds that they had failed to cooperate.

Accordingly, Jacobson's motion for summary judgment on the issue of exhaustion of administrative remedies is denied.

## IV.    Title VII Religious Accommodation Claim

### A.    Applicable Law

Under Title VII, an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of an individual's religion.  42 U.S.C. § 2000e-2(a)(1).  The term "religion" is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  Courts thus have recognized, as a variant of a religious discrimination claim, a cause of action for an employer's failure to reasonably accommodate an employee's religious beliefs.  See Goldmeier v. Allstate Ins. Co., 337 F.3d 629, 633 (6th Cir. 2003) ("Religious discrimination can arise out of an employer's failure to accommodate those employees who refuse to work on particular days of the week because of their religious beliefs.") (internal quotation marks omitted).

In light of the reasonable accommodation standard expressly incorporated into the definition of "religion," the Supreme Court has held:

> . . . Title VII does not demand mere neutrality with regard to religious practices – that they be treated no worse than other practices.  Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's" "religious observance and practice."  An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter.  But when an applicant requires an accommodation as an "aspec[t] of religious ... practice," it is no response that the subsequent "fail[ure] ... to hire" was due to an otherwise-neutral policy.  Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

E.E.O.C. v. Abercrombie & Fitch Stores, Inc., __ U.S. __, 135 S. Ct. 2028, 2034 (2015) (Scalia, J.).

"The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination."  Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir. 1987).  In order to establish a prima facie case, plaintiffs must show that they: (1) hold a sincere religious belief that conflicts with an employment requirement; (2) have informed the employer about the conflict; and (3) were discharged or disciplined for failing to comply with the conflicting employment requirement.  Id.

Once an employee establishes a prima facie case, the employer has the burden "to show that it could not reasonably accommodate the employee without undue hardship." Virts v. Consol. Freightways Corp., 285 F.3d 508, 516 (6th Cir. 2002) (citations omitted). For the purpose of religious accommodations, "[t]o require an employer to bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs is an undue hardship." Cooper v. Oak Rubber Co., 15 F.3d 1375, 1378 (6th Cir. 1994) (citing Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84 (1977)).

**B.      Prima Facie Case**

Defendants do not dispute that plaintiffs have met the first two elements of their prima facie case. Plaintiffs have submitted sufficient evidence, by way of deposition testimony and an expert report, to support an inference that they have a sincere religious belief that: (1) they must perform the Muslim *salat*, or ritual prayer, five times a day and (2) their prayers are not acceptable to Allah unless performed in accordance with certain standards of cleanliness, seclusion, and punctuality.[13]

A conflict between plaintiffs' beliefs and the employer's requirements arose when defendants decided to no longer allow plaintiffs to perform their prayers in the location on the production floor where they had previously been able to perform prayers. Plaintiffs uniformly testified that the alternate prayer sites offered by defendants did not meet the religious standards plaintiffs had for cleanliness and seclusion.

**1.      The Requirement of an Act of Discharge or Discipline**

Defendants argue that plaintiffs cannot establish the third element of their prima facie case because they voluntarily walked off their jobs and were not discharged or disciplined. In response, plaintiffs advocate "revisiting" this element of the prima facie case. (Doc. 69 at 41).

The requirement of a discharge or discipline for a reasonable accommodation claim has received criticism. In Lawson v. Washington, 319 F.3d 498 (9th Cir. 2003) (denying a rehearing *en banc*), the dissent argued that the failure to accommodate should itself constitute a Title VII violation and that an employee should not have to first endure discipline or discharge before a cause of action accrues. 319 F.3d at 499, 502 (Berzon, J., dissenting). The dissent reasoned that the "otherwise to

---

[13]  It is not the court's role to question the religious validity of sincerely-held beliefs. See United States v. Seeger, 380 U.S. 163, 184 (1965) ( "In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight. . . . The validity of what he believes cannot be questioned."); Redmond v. GAF Corp., 574 F.2d 897, 901 n.12 (7th Cir. 1978) (explaining that a religious belief is a belief that is considered religious "in [the] person's own scheme of things" and is "sincerely held").

discriminate" language in § 2000e-2(a)(1) (making it unlawful to "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate"), when read in conjunction with the "reasonably accommodate" language of § 2000e(j), must mean that "accommodation is a statutory obligation and that failing to accommodate is itself an unlawful employment practice, without regard to whether another employment consequence, other than the failure to accommodate, is visited upon the employee." 319 F.3d at 499-500 (Berzon, J., dissenting) (citing Hardison, 432 U.S. at 75, which stated that "the employer's statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship, is clear").

In a more recent case, a district court in the Seventh Circuit reviewed the issue as follows:

The last requirement of a prima facie case presents somewhat of a problem, which neither party has squarely addressed. As previously noted, the formulation most frequently cited by the Seventh Circuit for the last requirement of a prima facie case is that the plaintiff must show that the religious observance or practice was the basis for the plaintiff's "discharge or other discriminatory treatment." [EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1575 (7th Cir. 1996)]. But Seventh Circuit case law gives very little guidance as to what the term "discharge or other discriminatory treatment" means. On the one hand, the concept might be the same as the term "adverse employment action," as interpreted and applied in Title VII disparate treatment cases. Indeed, some of the cases in this circuit do use the term "adverse employment action" in place of the term "discharge or other discriminatory treatment" for the third prerequisite to a plaintiff's prima facie religious accommodation case. . . . But these cases appear to invoke the adverse employment action requirement without consciously considering whether that term is appropriate in the context of a religious failure to accommodate case. Since such cases generally deal with obvious adverse employment actions . . . they cannot be said to stand for the proposition that an adverse employment action is required. . . .

Several other circuits have held that an adverse employment action is required in a religious failure to accommodate case, although it is not entirely clear whether those circuits ascribe the same meaning to that term as does the Seventh Circuit. Cases within this circuit at the district court level are somewhat mixed. . . .

While not discussing the issue, the Seventh Circuit's opinion in [Porter v. City of Chicago, 700 F.3d 944 (7th Cir. 2012)], suggests that an adverse employment action is not required in a religious failure to accommodate case. There the court based its affirmance of the district court's denial of the plaintiff's failure to accommodate claim on a finding that the employer had offered a reasonable accommodation. But the court also affirmed the district court's denial of the plaintiff's disparate treatment claim, doing so based on a finding that the plaintiff had not alleged an adverse employment action. If an adverse employment action was required for the religious accommodation claim as well as for the religious disparate treatment claim, then presumably the court would not have had to reach the issue of whether the employer's accommodation of the plaintiff's religious beliefs was reasonable.

Nichols v. Illinois Dep't of Transportation, 152 F.Supp.3d 1106, 1121-22 (N.D. Ill. 2016) (footnotes and internal citations omitted). The court declined to make a "definitive ruling" on the issue because the plaintiff had been terminated. But the court opined that it "makes sense" for an employer's failure to accommodate to "be sufficient in and of itself to support a religious failure to accommodate claim" because "the injury in a failure to accommodate is the inability to practice one's religion that occurs immediately, not later when there may be some possibly related job action." Id. at 1122.

In light of these critiques, plaintiffs urge this court to hold that discharge or discipline is not an element of a prima facie case. However, this court cannot do so, for the Sixth Circuit has squarely held in a published opinion that "a prima facie case of religious discrimination requires discharge or discipline for failure to comply with an employment requirement conflicting with a requirement." Goldmeier, 337 F.3d at 634-35. The court noted that the Sixth Circuit had "consistently held" as such. Id. (citing Virts, 285 F.3d at 516; Cooper, 15 F.3d at 1378; Pyro Mining, 827 F.2d at 1085). And the court expressly rejected the argument that requiring discharge or discipline is "obsolete." Id. at 636-37 ("[W]e hold that discharge or discipline remains an element of a prima facie case of religious discrimination in employment.").

Since Goldmeier, the Sixth Circuit has acknowledged the dissent in the Ninth Circuit's Lawson case, but affirmed its position that discharge or discipline is an element of a prima facie case for religious accommodation. Tepper v. Potter, 505 F.3d 508, 514 (6th Cir. 2007); see also Crider v. Univ. of Tennessee, 492 Fed. App'x 609, 613 (6th Cir. 2012) (reciting the elements of a prima facie case as including discharge or discipline). In an unpublished opinion, the court stated, "We have declined to relieve a religious accommodation plaintiff of his burden to establish a prima facie case, including the requirement that he demonstrate that he has been discharged or disciplined. . . . Unless a plaintiff has suffered some independent harm caused by a conflict between his employment obligation and his religion, a defendant has no duty to make any kind of accommodation." Reed v. Int'l Union, No. 07-2505, 2009 WL 5943111, at *3 (6th Cir. May 7, 2009) (citing Goldmeier, 337 F.3d at 634-35).

Thus, discharge or discipline is an element of a prima facie case of religious discrimination. A plaintiff may satisfy this element by showing that he was actually discharged or disciplined, or, in the alternative, that he was constructively discharged. See Goldmeier, 337 F.3d at 635.

## 2. Actual Discharge

The parties disagree over how to characterize the end of plaintiffs' employment on the evening of January 14, 2014. Defendants argue that plaintiffs abandoned their jobs, choosing to quit when they realized they would no longer be able to pray at their preferred spot on the production floor. Defendants maintain that they in good faith offered plaintiffs other places to pray and did not tell any of the plaintiffs that they were being fired or disciplined. Defendants note that line supervisor Diako pleaded with plaintiffs to come back to work, going so far as to offer to make one of his superiors available the next day to meet with plaintiffs about potential accommodations. In defendants' view, plaintiffs refused to engage in a cooperative process and only after plaintiffs walked off from their jobs did defendants consider them to be no longer employed.

Plaintiffs, on the other hand, point to evidence that Diako and Lopez told the group during the 6:00 p.m. break that whoever did not return to work immediately would be fired. Plaintiffs argue that being presented with the choice of returning to work without having performed their prayers or being fired is the same as an actual discharge: "Telling an employee he or she is fired unless they return to work or should never return to work if they leave constitutes an actual discharge on the facts before the Court." (Doc. 69 at 55). In support, plaintiffs cite three cases they believe stand for the proposition that a discharge which proximately follows the plaintiffs' insistence on performing a religious observance is the equivalent of an actual discharge.

In <u>Adeyeye v. Heartland Sweeteners, LLC</u>, 721 F.3d 444 (7th Cir. 2013), plaintiff requested substantial leave time (beyond the amount of personal leave he had accrued) to participate in religious burial rites for his deceased father in Nigeria. His request was denied but plaintiff made the trip anyway. When plaintiff returned from Nigeria and reported to work, he was informed that he had been terminated. Plaintiff brought a Title VII failure to accommodate claim, to which defendant argued that his termination "was caused by his absence rather than the refusal to accommodate his religious beliefs." 721 F.3d at 454. The court called this argument "sophistry": "Adeyeye was absent to observe his religious practices, and he was fired as a result of that absence. It is as simple as that." <u>Id</u>. The court explained that the issue of whether the employer's decision to terminate plaintiff was "'supported by legitimate concerns for its business goes to the issue of undue hardship, and not to whether a prima facie case was shown.'" <u>Id</u>. (quoting <u>EEOC v. Ilona of Hungary, Inc.</u>, 108 F.3d 1569, 1575 (7th Cir. 1997)).

In <u>Jiglov v. Hotel Peabody, G.P.</u>, 719 F.Supp.2d 918 (W.D. Tenn. 2010), plaintiff requested a day off so that he could observe the Russian Orthodox Easter holiday. The defendant denied the

request and terminated plaintiff for gross misconduct when he failed to come to work that day. The court found that plaintiff had satisfied the third element of a prima facie case because the discharge was for failing to comply with the employer's requirement that he work on the religious holiday. See 719 F.Supp.2d at 931.

In Maroko v. Werner Enterprises, Inc., 778 F.Supp.2d 993 (D. Minn. 2011), plaintiff, upon completing his training to be a truck driver for defendant, requested that he not be assigned deliveries on the Sabbath. He called in to receive assignments, but defendant never gave him any and eventually retrieved the truck it had provided to him. Defendant argued that plaintiff could not establish his prima facie case because he had abandoned his job – an argument the court rejected:

> At the outset, it is disingenuous for Werner to argue that Maroko abandoned his job when it was *the company* that decided not to assign him any work. . . .
>
> But regardless, even if Maroko had somehow "abandoned" his job, the facts show that it was because Werner told him it could not accommodate his religious beliefs. . . . Put another way, the Sabbath-work requirement was the proximate cause of the termination of Maroko's employment. That is sufficient to establish the third element of his prima facie case. Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024, 1034 (8th Cir. 2008).

Maroko, 778 F.Supp.2d at 999 (emphasis in original).

Here, there is no doubt that plaintiffs were terminated. The plaintiffs who contacted 1st Class in the days after January 14, 2014 were told so. The parties' disagreement concerns the causation component of the third element of a prima facie case – whether plaintiffs were discharged for abandoning their jobs or discharged for observing their prayers after supervisors had told them to return from break time to work. See Pyro Mining, 827 F.2d at 1085 (holding that the third element requires a showing that plaintiffs were discharged or disciplined *for* failing to comply with the conflicting employment requirement); Adeyeye, 721 F.3d at 454 (referring to the third prong of a prima facie case as a "causation" element and holding that plaintiff had submitted sufficient evidence to support an inference that his "religious observance caused his termination"); Maroko, 778 F.Supp.2d at 999 (referring to proximate causation).

In each of the cases cited by plaintiffs, the employer denied the employee an accommodation in the form of being absent from work to perform a religious observance. And the employee in each case was discharged after having missed work for the religious observance. Such is the case here, when viewing the evidence in a light favorable to plaintiffs.

Plaintiffs' religious beliefs required them to perform their prayers at particular times, and they used their break periods to do so. Defendants do not dispute that, after several years of observing Muslim employees using their breaks to pray, they were generally aware of the frequency and timing of plaintiffs' prayer practices at work.

At the start of the shift on January 14, defendants announced that Muslim employees would no longer be able pray at their usual spot, effective immediately. Most plaintiffs agree that Lopez told them of their alternatives, but she deflected any discussion about the matter until the first break. This created a predictable dilemma at the first break – at the very time plaintiffs needed to perform their sunset prayer, they would have to first discuss alternatives and accommodations with defendants.

When the first break arrived, plaintiffs told defendants that the alternate prayer sites were not acceptable places in which to pray, for reasons grounded in plaintiffs' religious beliefs. See Adeyeye, 721 F.3d at 450 (holding that an "employee must make the request reasonably clear so as to alert the employer to the fact that the request is motivated by a religious belief"). Defendants, in the midst of the commotion and language barrier, may not have had a perfect grasp of those reasons. But Nye, Diako and Lopez understood that plaintiffs' refusal to pray in the alternate sites had a basis in plaintiffs' religious beliefs – that those places had too much foot traffic, noise and distraction for plaintiffs to maintain concentration during their prayers. (Nye Dep. at 97-98; Diako Dep. at 141-42; Lopez Dep. at 74, 81-82).

In response to plaintiffs' religious-based opposition to the alternate prayer sites, defendants held firm to those sites being plaintiffs' only options for the rest of the shift. In plaintiffs' view, this left them with no acceptable place at the facility to perform their mandatory sunset and evening prayers that night. And plaintiffs told defendants so: "He [Diako] said we cannot pray. We told him that we cannot miss that prayer. . . . It's against our religion to miss one prayer and you're telling us to miss two prayers." (Abikar Dep. at 33). Plaintiffs, who were now outside and getting ready to leave, made it known in word and action that they would leave work to go elsewhere to pray if defendants refused to give them an appropriate place to pray. Defendants told the group that no further accommodations would be made. (Diako Dep. at 148) (testifying that plaintiffs asked how they could pray "[f]or right now," to which he responded that the lobby or breakroom were the only options). And, crediting plaintiffs' account, defendants threatened to fire anyone who left to go pray. (Abikar Dep. at 34) ("He told us you have to go back to work. It's time to work, and if you're not going back to work, you are fired."). Plaintiffs did leave and defendants confirmed to the

plaintiffs who later called or came in that they had been terminated. The court finds that under these circumstances, a factfinder could reasonably conclude that defendants actually discharged plaintiffs for being absent to perform their prayers. See Maroko, 778 F.Supp.2d at 999 ("[E]ven if Maroko had somehow 'abandoned' his job, the facts show that it was because Werner told him it could not accommodate his religious beliefs.").

### 3.    Constructive Discharge

A plaintiff may alternatively satisfy the discharge or discipline prong of a prima facie case by showing that he was constructively discharged. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.' . . . When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." Green v. Brennan, __ U.S. __, 136 S.Ct. 1769, 1776-77 (2016) (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004)). See also Smith v. Henderson, 376 F.3d 529, 533–34 (6th Cir. 2004) ("A constructive discharge requires a determination that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (internal quotations and citations omitted).

In order to establish a constructive discharge, plaintiff must show that: (1) "the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and (2) the employer did so "with the intention of forcing the employee to quit." Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999); Logan v. Denny's, Inc., 259 F.3d 558, 568-69 (6th Cir. 2001); Henry v. Abbott Labs., 651 Fed. App'x 494, 507 (6th Cir. 2016); Fletcher v. U.S. Renal Care, Inc., No. 1:15-CV-491, 2017 WL 821669, at *6 (S.D. Ohio Mar. 2, 2017). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." Moore, 171 F.3d at 1080; Logan, 259 F.3d at 569.

Courts should examine all of the circumstances in determining whether work conditions are such that a reasonable person would find them to be intolerable. See Goldmeier, 337 F.3d at 635. Here, plaintiffs have submitted sufficient evidence, for purposes of surviving the motion for summary judgment, on this issue. Plaintiffs have identified numerous factors from which a jury could find that a reasonable member of the plaintiff group would have felt helpless, intimidated or coerced. Defendants abruptly announced they were eliminating plaintiffs' place of prayer; this decision came without warning to plaintiffs. Defendants then pronounced the alternate sites that

would be available, without having sought plaintiffs' input, and foreclosed any discussion of the matter before the shift started. Defendants instructed plaintiffs to start work and deflected their feedback until the first break. Again, this created a foreseeable crisis during the break – at the time plaintiffs needed to perform the sunset prayer, they instead would have to attempt to use that narrow window of time to communicate their objections to defendants and resolve the matter. When the break arrived, plaintiffs were met with the physical presence of forklifts blocking the old prayer site, and two plaintiffs, Abikar and Alin, testified that they felt threatened by forklift drivers. Plaintiffs strained, through language barriers, to communicate their objections to the alternate prayer sites to Lopez, Diako and Nye. Defendants refused to accommodate plaintiffs' requests for a secluded and clean prayer site. According to some plaintiffs, Diako ordered them outside to stand in the cold while they unsuccessfully continued to lobby for a suitable prayer site. Defendants threatened that they would fire any employee who left work to perform their mandatory prayer. A police officer arrived on the scene and dispersed plaintiffs after reiterating defendants' directive that they either leave or return to work. Form these circumstances, a jury could find that defendants deliberately created an intolerable situation for a reasonable member of plaintiffs' group. See Goldmeier, 337 F.3d at 635 ("The circumstances are examined from the point of view of a reasonable member of the protected class.").

Turning to the element of defendants' intent to force plaintiffs to quit, the court finds that the evidence supports a reasonable inference that defendants did act with such intent. Admittedly, defendants have submitted evidence in support of their contention that they were acting in good faith. The decision to eliminate the old prayer spot arose from a concern over workplace safety. Nye and Hanna testified that they were attempting to be as accommodating as possible – to the point of offering plaintiffs all of the non-production floor areas controlled by Jacobson in the Mars facility other then the business office. (Hanna Dep. at 87) (stating that he was willing for Muslim employees to have "all the other public areas"); (Nye Dep. at 75-76) (describing that he and Hanna were trying to think of every place they could offer to plaintiffs, excluding the production floor). And defendants deny ever having threatened to fire plaintiffs if they left at the break.

Nonetheless, the evidence submitted by plaintiffs supports a different conclusion. In selecting the alternatives they would offer to plaintiffs, Nye and Hanna chose not to consult plaintiffs or a human resources manager, or to otherwise familiarize themselves with the conditions under which plaintiffs believed they had to perform their prayers. Defendants forced those options upon plaintiffs and refused to accommodate their concerns about the alternate sites. When

plaintiffs explained that they felt they had no place to pray at the facility and that they needed to leave to pray, defendants threatened to fire plaintiffs. This threat to fire plaintiffs came after they had stated that it was against their religion to miss even one prayer. A jury could find from these facts that defendants deliberately created a situation in which it was foreseeable that plaintiffs would feel compelled to quit. See Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999) ("Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions.").

### C. Reasonable Accommodation

Once an employee establishes a prima facie case, the burden shifts to the employer "to show that it could not reasonably accommodate the employee without undue hardship." Virts, 285 F.3d at 516. "'The reasonableness of an employer's attempt to accommodate is determined on a case-by-case basis.'" Id. (quoting Cooper, 15 F.3d at 1378).

Defendants argue that, as a matter of law, they reasonably accommodated the plaintiffs by offering as much of the non-production floor area of the facility as they could. Defendants make much of plaintiffs' alleged refusal to engage in a cooperative process, arguing that plaintiffs acted like an angry mob and abandoned their obligation to cooperate with defendants. Defendants further contend that they did not have to accommodate plaintiffs' insistence on a clean, secluded place to pray because an employee is not entitled to his ideal accommodation. See Creusere v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati, 88 Fed. App'x 813, 819 (6th Cir. 2003) (holding that the duty of reasonable accommodation "does not require the employer to accommodate the employee in the way the employee finds to be the most desirable").

Plaintiffs, in turn, blame defendants for the breakdown in communication on the evening of January 14, 2014. Plaintiffs argue that defendants presented the alternate prayer sites as a take-it-or-leave-it edict, and, when plaintiffs explained their objections and their need to pray at the breaks that evening, defendants refused to listen to plaintiffs' requests. In response to defendants' point that an employee is not entitled to his ideal accommodation, plaintiffs argue that an employee does not have to compromise to the point of violating a religious belief. Plaintiffs cite three Sixth Circuit cases which support that proposition. In Cooper, plaintiff was a Seventh Day Adventist who refused to work on Saturdays in order to observe the Sabbath. The employer offered an accommodation (trading her Saturday day shift for the Friday night shift) that would have allowed plaintiff to attend church service on Saturday but still required her to work partly on Saturday. The court held that the employer was not entitled to judgment on the issue of reasonable accommodation because "[a]n

employer does not fulfill its obligation to reasonably accommodate a religious belief when it is confronted with two religious objections and offers an accommodation which completely ignores one." 15 F.3d at 1379. Accord Pyro Mining, 827 F.2d at 1088 ("[W]here an employee sincerely believes that working on Sunday is morally wrong and that it is a sin to try to induce another to work in his stead, then an employer's attempt at accommodation that requires the employee to seek his own replacement is not reasonable."); Crider, 492 Fed. App'x at 612-13 ("[C]ooperation is not synonymous with compromise, where such compromise would be in violation of the employees' religious needs. Offering Crider fewer Saturday shifts is not a reasonable accommodation to religious beliefs which prohibit working on Saturdays."). See also Ilona of Hungary, 108 F.3d at 1576 ("The offered accommodation cannot be considered reasonable . . . because it does not eliminate the conflict between the employment requirement and the religious practice.").

The court finds that defendants are not entitled to summary judgment on the issue of whether they offered a reasonable accommodation to plaintiffs on the evening of January 14. Both parties are correct that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 69 (1986). While the employer bears the burden to "accommodate the employee's religious needs, the employee must make some effort to cooperate with an employer's attempt at accommodation." Pyro Mining, 827 F.2d at 1088. The parties have submitted evidence from which there is clearly a genuine dispute of material fact over which side is most at fault for the breakdown in cooperation. Plaintiffs have shown that defendants failed to give plaintiffs notice about the elimination of the old prayer spot, failed to consult plaintiffs about suitable alternate prayer sites, presented the alternatives in take-it-or-leave it fashion, and refused to budge when plaintiffs raised their objections at the break. Defendants, in contrast, have submitted evidence from which one could find that plaintiffs' inability to speak English, their impatience and flat rejection of the alternatives, and their insistence on praying at the old spot contributed significantly to the failure in communication. A jury should decide whether defendants satisfied their burden of making a reasonable attempt at accommodating plaintiffs' religious beliefs.

Defendants next argue that, even if there is a factual dispute over what happened the evening of January 14, an employer has no duty to make an immediate accommodation. That is, defendants cannot be liable for not accommodating plaintiffs' on-the-spot demand at the first break for a secluded and clean place to pray. Defendants argue that it was sufficient that they offered to meet with representatives of plaintiffs' group on the next day to discuss accommodations.

Defendants cite an unpublished case, Bowles v. N.Y. City Transit Auth., No. 00-Civ. 4213, 2006 WL 1418602 (S.D.N.Y. May 23, 2016), which somewhat supports their proposition. Plaintiff was a union worker whose shift was determined by a seniority-based bid system. A new hire, plaintiff was left to choose from shifts that had Sunday work hours, which conflicted with his belief against working on the Sabbath. Plaintiff took a shift that allowed him to attend religious services on Sundays, but requested that he be assigned a shift with Sundays off work. Plaintiff apparently worked on Sundays while his employer considered his request to work a different shift. After about four months, the employer offered plaintiff a shift with Sundays off. Plaintiff argued that the four-month delay in accommodating him amounted to a refusal to accommodate. The court noted that it was "unable to find . . . a decision that addresses when a delay in accommodating becomes for Title VII purposes a refusal to accommodate." Bowles, 2006 WL 1418602 at *9. The court then stated, without providing a rationale, that "the delay here cannot serve as a refusal to accommodate."[14] Id. at *9.

The court agrees that, under certain circumstances, the accommodation process might take some amount of time and waiting one day for a meeting with supervisors would be reasonable. However, the unexplained statement in Bowles concerning a four-month delay is of dubious value in this circuit, where "'a week-to-week, wait-and-see posture' amounts to no accommodation at all." E.E.O.C. v. Robert Bosch Corp., 169 Fed. App'x 942, 945 (6th Cir. 2006) (quoting EEOC v. Arlington Transit Mix, Inc., 957 F.2d 219, 222 (6th Cir. 1991)).

"The reasonableness of an employer's attempt at accommodation must be determined on a case-by-case basis and is generally a question of fact for the jury, rather than a question of law for the court." Robert Bosch, 169 Fed. App'x at 944 (citing cases). It is not the case here that plaintiffs were recently-hired employees who initiated a request for a new accommodation which the employer needed some amount of time to consider or implement. Instead, defendants eliminated an existing accommodation (the old prayer spot) which Muslim employees had relied on for several years. A jury crediting plaintiffs' version of events could reasonably find that defendants abruptly

---

[14] The court dismissed the religious accommodation claim on the ground that plaintiff did not suffer any adverse employment action (because the employer gave him a shift with Sundays off) and thus could not establish a prima facie case. Bowles, 2006 WL 1418602 at *10. On appeal, the Second Circuit affirmed and limited its holding to the district court's analysis of the prima facie case. 285 Fed. App'x 812, 813 (2d Cir. 2008). The Second Circuit did not address the issue of the four-month delay.

announced the decision, unilaterally selected alternate sites and precluded discussion despite knowing plaintiffs would need to pray at the first break. A jury could further find that defendants created this exigency and should have been more flexible and better prepared to make an on-the-spot accommodation to plaintiffs for the rest of the shift. See Robert Bosch., 169 Fed. App'x at 945 (holding that where the employer eliminated an accommodation that had existed for many years, a jury should determine "how far the company" should have been "willing to go to help Carter observe his Sabbath"); Baker v. Home Depot, 445 F.3d 541 (2d Cir. 2006) (reversing the district court's grant of summary judgment on the reasonable accommodation issue where employer eliminated an accommodation that it had granted for over one year).

### D. Undue Hardship

Courts often state that an undue hardship is one for which an employer would bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs. See Tepper v. Potter, 505 F.3d 508 (6th Cir. 2007); Cooper, 15 F.3d at 1378. Even so, an "'undue hardship is something greater than hardship, and an employer does not sustain his burden of proof merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine.'" Crider, 492 Fed. App'x at 612-13 (quoting Draper v. U.S. Pipe & Foundry Co., 527 F.2d 515, 520 (6th Cir. 1975)).

The court finds that defendants are not entitled to summary judgment on the undue hardship issue. As plaintiffs point out, the solution defendants adopted a couple of months after plaintiffs were terminated – clearing a space in the breakroom and hanging curtains to provide seclusion – proves how easily defendants could have accommodated plaintiffs. Defendants do not deny that creating the prayer space was not costly or burdensome, and Hanna testified that it took three hours to create the space. (Hanna Dep. at 62).

Plaintiffs, recognizing that a jury might find that defendants could not have been expected to hang curtains in time for the first break on January 14,[15] argue that defendants could have adopted interim measures that evening without undue hardship. Plaintiffs have identified several possible temporary accommodations which, the court agrees, seemingly would have imposed no more than a *de minimis* burden. For instance, one plaintiff requested that the group be allowed to take their break either 15 minutes early or 15 minutes late so that they could have the breakroom to themselves. (Ismail Dep. at 77-78). Another asked that they be allowed to use the orientation room inside the

---

[15] Hanna testified that the maintenance worker who hung the curtains used materials that he had to go somewhere to buy. (Hanna Dep. at 63).

business office.  (Id. at 37).  Plaintiffs also suggest that it would not have been burdensome for defendants to have appointed someone to serve as a "safety monitor" to watch and ensure plaintiffs' safety as they prayed at the old spot during a break or two while curtains or dividers were being placed in the breakroom.

Defendants object that it is disingenuous for plaintiffs to now offer the ideas of hanging curtains in the breakroom or posting a safety monitor when none of the plaintiffs actually proposed those accommodations on January 14.  Defendants further argue that the safety risks inherent with allowing plaintiffs to pray on the production floor, even with a safety monitor, are obvious (plaintiffs are prostrate at times) and that Jacobson would have violated federal Occupational Safety and Health Administration regulations by allowing it.  See 29 C.F.R. § 1910.176(a) ("Where mechanical handling equipment is used, sufficient safe clearances shall be allowed for aisles. . . .  Aisles and passageways shall be kept clear . . . with no obstruction across or in the aisles that could create a hazard.").

It is generally true that a plaintiff may not rely on an accommodation which he did not actually request.  See Virts, 285 F.3d at 518.  However, a genuine issue of fact exists over whether defendants "inhibited, frustrated or impeded" plaintiffs from having the opportunity to conceive and discuss possible accommodations.  Crider, 492 Fed. App'x at 612-13 (holding that summary judgment was inappropriate because there was a genuine dispute over whether the employer had effected a "frustration of accommodation").  A jury could find that the manner in which defendants suddenly eliminated the old prayer spot and foreclosed discussion of the matter thwarted plaintiffs from being able to engage in a cooperative process in which they well might have proposed the accommodations of a curtain or divider in the breakroom and an interim safety monitor.

Defendants are also generally correct that "safety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business."  Draper, 527 F.2d at 521.  However, the alleged safety burden must be more than a speculative concern.  See id. at 520 ("We are somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice."); Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024, 1033, n.4 (8th Cir. 2008) ("[A]n employer must establish that the hardship is real rather than speculative . . . merely conceivable, or hypothetical.") (internal quotation marks omitted).  The record contains no evidence about the burden or safety risks involved with having a safety monitor present and ceasing forklift activity in the area for one or two break periods.

Thus, the court finds that the motions for summary judgment should be denied with respect to plaintiffs' religious accommodation claim.

## V.     Title VII Retaliation Claim

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees" because the employee "opposed . . . an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e–3(a).

In order to establish a prima facie case of retaliation, a plaintiff must prove: "(1) he engaged in activity protected under Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (citation omitted). Retaliation claims under Title VII must be analyzed under the traditional but-for causation standard, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. S.W. Med. Center v. Nassar, __ U.S. __, 133 S.Ct. 2517, 2533 (2013).

Plaintiffs allege that they were discharged in retaliation for asserting their right to a religious accommodation at work. Defendants argue that plaintiffs voluntarily quit and did not suffer an adverse action. On this issue, both parties make the same arguments they made with respect to the discharge element of the plaintiffs' prima facie case for failure to accommodate. And for the reasons stated above, the court finds that there is a genuine dispute of material fact regarding whether plaintiffs voluntarily left their jobs or whether defendants discharged plaintiffs, and, if the latter, whether the discharge was causally connected to plaintiffs' demand to pray in a suitable place.

Defendants further argue that plaintiffs' retaliation claim fails because defendants eliminated the old prayer spot out of a concern for safety and thus had a legitimate, non-discriminatory reason for their actions. This argument is misdirected. Once an employee has established a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the *challenged employment action*." Russell v. Univ. of Toledo, 537 F.3d 596, 604 (6th Cir. 2008) (emphasis added). Defendants' decision to eliminate the old prayer spot (which plaintiffs acknowledge arose from legitimate safety concerns) is not the challenged employment action. Rather, defendants' alleged discharge of plaintiffs is the challenged action.

Thus, the court finds that the motions for summary judgment should be denied with respect to plaintiffs' retaliation claim.

## VI.     Conclusion

For the reasons stated above, defendants' motions for summary judgment (docs. 32, 46, 47) are DENIED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: December 14, 2017